# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DERRICK L. NORMAN,
　　　　*Plaintiff*,

*v.*                                             CASE NO. 2:14-CV-10038-LPZ-PTM

COMMISSIONER OF                    DISTRICT JUDGE LAWRENCE P. ZATKOFF
SOCIAL SECURITY,                     MAGISTRATE JUDGE PATRICIA T. MORRIS

　　　　*Defendant*.

_____/


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.　　RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the

Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS**

**RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and that

Defendant's Motion for Summary Judgment be **GRANTED**.

## II.　　REPORT

### A.　　Introduction and Procedural History

This case was referred to Magistrate Judge Patricia T. Morris, *see* 28 U.S.C. §

636(b)(1)(B); E.D. Mich. LR 72.1(b)(3), by Notice of Reference to review the Commissioner's

_____

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008 RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

decision denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). This matter is currently before the Court on cross-motions for summary judgment. (Docs. 12, 13.)

Plaintiff Derrick Norman was forty-three years old at the time of the most recent administrative hearing on September 6, 2012. (Transcript, Doc. 8 at 43, 256.) In the fifteen years preceding Plaintiff's alleged disability onset, he worked full-time in general labor, plumbing, and construction. (Tr. at 290.) Plaintiff filed the present claim on June 29, 2010, alleging that he became unable to work on February 8, 2009. (Tr. at 256.) The claim was denied at the initial administrative stage. (Tr. at 93.) In denying Plaintiff's claims, the Commissioner considered visual disturbances and affective disorders. (*Id.*) On September 15, 2011, Plaintiff appeared before Administrative Law Judge ("ALJ") John J. Rabaut, who considered the application for benefits *de novo*. (Tr. at 60-90.) In a decision dated September 23, 2011, the ALJ found that Plaintiff was not disabled. (Tr. at 94-111.)

On October 26, 2011, Plaintiff asked the Appeals Council to review this decision. (Tr. at 166-68.) On February 13, 2012, the Appeals Council vacated ALJ Rabaut's decision and remanded the case to another ALJ to issue a new decision. (Tr. at 112-15.) The Appeals Council identified two issues for resolution: (1) Because the first vocational expert ("VE") enumerated jobs that were "inconsistent with the claimant's [RFC]," supplemental VE testimony was required; and (2) ALJ Rabaut discredited Plaintiff because he had represented himself as able to work in order to collect unemployment benefits, despite the fact that "receipt of unemployment benefits is only one of many factors that must be considered when determining whether the claimant is disabled," and therefore further evaluation of Plaintiff's credibility was required. (Tr. at 113.) On September 15, 2012, Plaintiff appeared before ALJ Roy L. Roulhac, who issued an unfavorable decision on October 10, 2012. (Tr. at 22-59.)

Plaintiff requested Appeals Council review of this decision on November 4, 2012. (Tr. at 20-21.)

The second ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on December 12, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-4.) On January 6, 2014, Plaintiff filed the instant suit, seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1 at 1.)

### B.      Standard of Review

The Social Security Administration has promulgated the following rules for the administration of disability benefits. *See* 20 C.F.R. §§ 401-422. First, a state agency, acting under the authority and supervision of the Administration, usually makes the initial determination of whether a person is disabled. 20 C.F.R. § 404.1503; *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). If denied, the claimant may seek review of the state's decision through the Administration's three-stage review process. *Bowen*, 482 U.S. at 142. In the first step of this process, the state's disability determination is reconsidered *de novo* by the state agency. *Id.* Next the claimant has the right to a hearing before an ALJ. *Id.* Finally, "the claimant may seek review by the Appeals Council." *Id.* Only after the Commissioner has issued a final administrative decision that is unfavorable may the claimant file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decisions under 42 U.S.C. § 405(g). This is a limited review where we "'must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in

the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (*quoting Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).

### C.     The ALJ's Five-Step Sequential Analysis

The "[c]laimant bears the burden of proving his [or her] entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). While, in general, the claimant "is responsible for providing the evidence" to make a residual functional capacity ("RFC") assessment, before a determination of not disabled is made, the Commissioner is "responsible for developing [a claimant's] complete medical history, including arranging for a consultative examination[] if necessary." 20 C.F.R. § 404.1545(a)(3).

Disability Insurance Benefits ("DIB"), provided for in Title II, 42 U.S.C. §§ 401-434, are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Supplemental Security Income ("SSI"), provided for in Title XVI, 42 U.S.C. §§ 1381-1385, is available to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905(a). Disability is to be determined through the application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920; *see also Heston v.Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by" an impairment that precludes performance of past relevant work. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003) (cited with approval in *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007)). If the analysis reaches step five, the burden shifts to the Commissioner to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citing 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(a)(4)(g)); *see also Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).

**D.     The Second ALJ's Findings**

The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through June 30, 2014, and had not engaged in substantial gainful activity since February 8, 2009, the alleged onset date. (Tr. at 22-42.) At step two, he found that Plaintiff's conditions of right eye blindness, migraines, major depressive disorder, and degenerative disc disease were "severe" within the meaning of 20 C.F.R. § 404.1520. (Tr. at 27-28.) At step three, he found that Plaintiff did not have an impairment or combination of impairments that met or was the medical equivalent of a listing in the regulations. (Tr. at 28-30.) At step four, he found that Plaintiff was unable to perform any past relevant work. (Tr. at 34.) He also found that Plaintiff was forty years old at the alleged onset date, putting him into the "younger individual" range of 18-44 years. (Tr. at 35.) At step five, he found that Plaintiff could perform light work with several limitations. (Tr. at 30.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 36.)

**E.     Administrative Record**

**1.     Medical History**

On May 29, 2010, Plaintiff was brought by ambulance to the emergency department of Detroit Medical Center because he "passed out while waiting at the stoplight." (Tr. at 342.) According to his wife his "eyes rolled back in his head and he was unresponsive for about 30 seconds." (*Id.*) His right pupil was fixed and dilated. (*Id.*) The final impression from this visit was "syncope." (*Id.*)

Plaintiff returned to the hospital on June 24, 2010, complaining of back pain. (Tr. at 347-49.) He had injured his back the night before when he attempted to lift his sister's wheelchair up some stairs. (*Id.*) He went to the emergency room and had a Toradol shot which

6

did not relieve the pain. (*Id.*) The majority of Plaintiff's pain was on the left lateral paravertebral musculature. (*Id.*) His straight leg raising test was negative bilaterally. (*Id.*) He had "full range of motion in both hips, knees and ankles without limitation." (*Id.*) He was treated with Vicodin and Flexeril and was told to follow up with Dr. Awan if his condition did not improve. (*Id.*)

Plaintiff was treated from April 13, 2009 to October 6, 2010; from January 5 to June 29, 2011; and from September 7, 2011 to May 31, 2012 at Highland Park Health Center. (Tr. at 362-70, 394-96.) Most of these records are illegible. On May 8, 2011, Plaintiff was prescribed a walking cane. (Tr. at 445.) Both Dr. Sanjay Lakhani, M.D and Dr. Caesar A. Austin, M.D. were physicians at Highland Park Health Center during the relevant time. (Tr. at 415, 459.)

On September 14, 2011, Dr. Lakhani completed a physical RFC questionnaire for Plaintiff. (Tr. at 412-15.) Dr. Lakhani said the first time he saw Plaintiff was in May 2005. (*Id.*) His diagnoses are mostly illegible, but seem to include problems with lumbar disc, cervical disc, depression, and blindness in the right eye. (*Id.*) Plaintiff's symptoms included neck pain, visual impairment, pain in right eye, pain in lower back, and pain in right arm. (*Id.*) When asked to identify the clinical and objective signs, Dr. Lakhani indicated a decreased range of motion in Plaintiff's neck, referenced the MRI, and performed a corneal examination. (*Id.*) Dr. Lakhani expected Plaintiff's impairments to last at least twelve months and he did not feel that Plaintiff was malingering. (*Id.*) He noted that emotional factors contributed to the severity of Plaintiff's symptoms. (*Id.*) He said that Plaintiff's depression affected his physical condition. (*Id.*) He said that Plaintiff's impairments were reasonably consistent with the symptoms and functional limitations described. (*Id.*)

Dr. Lakhani indicated that in a typical workday Plaintiff's pain or other symptoms would "frequently" be severe enough to interfere with the attention and concentration needed to perform even simple work tasks.  (*Id.*) He also indicated that Plaintiff was "[i]ncapable of even low stress jobs." (*Id.*) He said that Plaintiff could only sit for thirty to forty-five minutes before needing to stand up and he could only stand for thirty to forty-five minutes before needing to sit down or walk around. (*Id.*) He said Plaintiff could only sit and could only stand for less than two hours each in an eight hour period. (*Id.*) During an eight-hour workday, Plaintiff would need to walk around at least every thirty minutes for at least fifteen minutes per period. (*Id.*) He would need to alternate "at will" between sitting, standing, or walking. (*Id.*) He would need to take unscheduled breaks every thirty minutes for about fifteen minutes each in an eight hour work day. (*Id.*) He would not need a cane when engaging in occasional standing or walking. (*Id.*) He could occasionally lift and carry less than ten pounds, rarely lift and carry between ten and twenty pounds, and never lift or carry fifty pounds. (*Id.*) He could rarely look down, occasionally turn his head left or right, and rarely look up or hold his head in a static position. (*Id.*) He could occasionally twist and climb stairs, rarely stoop and crouch, and never climb ladders. (*Id.*) Dr. Lakhani estimated that Plaintiff would be absent from work more than four days per month as a result of his impairments. (*Id.*)

On September 5, 2012, Dr. Austin, M.D. completed a physical RFC questionnaire. (Tr. at 454-59.) Dr. Austin indicated that Plaintiff's first visit was May 5, 2005, and that he had diagnosed Plaintiff with cervical lumbar sacral disc disease, blindness in the right eye, glaucoma, and depression. (*Id.*) Plaintiff's symptoms were persistent headaches, neck and back pain, severe pain in the upper and lower extremities, and visual impairments in the right eye. (*Id.*) Clinical findings and objective signs included "decreased range of motion of cervical and

8

lumbar sacral spine" and an "MRI of cervical lumbar spine–cerv[ical] lumbar sacral disc disease." (*Id.*) Plaintiff's impairments had lasted or were expected to last at least twelve months. (*Id.*) Dr. Austin indicated that Plaintiff was not malingering. (*Id.*) He said that Plaintiff's depression affected his physical condition. (*Id.*) He indicated that in a typical workday Plaintiff's pain or other symptoms would "frequently" be severe enough to interfere with the attention and concentration needed to perform even simple work tasks.  (*Id.*) He also indicated that Plaintiff was "[i]ncapable of even low stress jobs." (*Id.*)

Dr. Austin stated that Plaintiff could only sit for thirty to forty-five minutes before needing to stand up and he could only stand for thirty to forty-five minutes before needing to sit down or walk around. (*Id.*) He said Plaintiff could only sit and could only stand for less than two hours each in an eight hour period. (*Id.*) During an eight-hour workday, Plaintiff would need to walk around at least every thirty minutes for at least fifteen minutes per period. (*Id.*) He would need to alternate "at will" between sitting, standing, or walking. (*Id.*) He would need to take unscheduled breaks every thirty minutes for about fifteen minutes each in an eight-hour work day. (*Id.*) His legs would need to be elevated to pillow height with prolonged sitting. (*Id.*)

Dr. Austin said Plaintiff needed a cane when engaging in occasional standing or walking. (*Id.*) He could occasionally lift and carry less than ten pounds, rarely lift and carry between ten and twenty pounds, and never lift or carry fifty pounds. (*Id.*) He could rarely look down, occasionally turn his head left or right, and rarely look up or hold his head in a static position. (*Id.*) He could occasionally climb stairs, rarely twist, stoop and crouch, and never climb ladders. (*Id.*) Dr. Austin estimated that Plaintiff would be absent from work more than four days per month as a result of his impairments. (*Id.*)

On August 18, 2011, Plaintiff was seen by ophthalmologist, Dr. Daniel Zuckerbrod, M.D. (Tr. at 400-07.) Dr. Zuckerbrod referred Plaintiff to Dr. Christopher Chow, M.D., who evaluated him on August 30, 2011. (Tr. at 399.) Plaintiff reported that he had been struck in the right eye with a blast of water from a power washer; he was unable to open his eye for two months after the injury. (*Id.*) His visual acuity without correction was 20/400 for his right eye, and 20/30-2 for his left eye. (*Id.*) The impression from this visit was "[f]ocal nasal corneal edema [right eye]" with a "[h]istory of blunt trauma [in the right eye] with traumatic mydriasis." (*Id.*) Plaintiff saw Dr. Zuckerbrod again from September 14, 2011 to March 7, 2012. (Tr. at 438.) The notes from these visits are illegible; it appears that he was complaining about, among other things, a cyst in his right eye. (*Id.*)

On November 10, 2010, Plaintiff had a consultative exam with Dr. Cynthia Shelby-Lane, M.D. (Tr. at 376-80.) Plaintiff reported that he had a history of right-eye blindness since he "was hit in the eye with a power washing machine" in 2005. (Tr. at 376.) He could see some light and his right pupil was irregular. (*Id.*) He reported that he had been treated by Kresge Eye Center since 2005. (*Id.*) He was having migraine headaches on a daily basis. (*Id.*) He was to follow up with a neurologist for his headaches. (*Id.*) He also was having chronic back pain and left shoulder pain. (Tr. at 376-77.) Dr. Shelby-Lane said that Plaintiff had "photophobia in his right eye," and occasional episodes of nausea and vomiting. (Tr. at 377.) She also said that the CT scan from May 29, 2010 was negative. (*Id.*) Plaintiff was not taking any medications. (*Id.*) He reported that he had struggled with depression since 1992. (*Id.*) Upon examination, Plaintiff's right eye was 20/200, his left eye was 20/20, and he had 20/40 for both. (*Id.*) Plaintiff was not using a cane, was able to get on and off the table without difficulty, his gait and stance were normal, he could tandem and heel toe walk, was able to squat, and his grip

10

strength was equal bilaterally. (Tr. at 378.) Dr. Shelby-Lane stated that "[b]ased on the history and exam, [Plaintiff had] significant visual loss in his right eye and chronic and ongoing headaches." (Tr. at 379.) He had never seen a neurologist for his headaches and was to begin treatment with one the next day. (*Id.*) Plaintiff had an x-ray of his lumbar spine; the impression was "negative lumbosacral spine." (Tr. at 380.)

Plaintiff also had a consultative exam with psychiatrist Dr. Surenda Kelwala on November 10, 2010. (Tr. at 381-85.) He had not received any psychiatric treatment since 1993, and he reported that in 1992 he had taken pills to attempt suicide. (Tr. at 382.) For daily functioning, he "got along pretty decently with coworkers and employers," and was "pleasant" with Dr. Kelwala; however, "[h]e appeared frustrated," and did not feel that what was happening to him was fair. (*Id.*) He used to like sports, but now he was not interested in anything because he was preoccupied with his inability to get a job. (*Id.*) He reported that he tried to help with work at home but he would get frustrated and his wife would take over. (*Id.*) He reported that he drove a limited amount. (Tr. at 383.) His contact with reality was "okay," his self-esteem was "not very good," he had "mild psychomotor retardation," he was "pleasant," he appeared to be "dependent upon his wife though he would rather be independent," he was motivated to get a job, and "had no tendency to exaggerate or minimize his symptoms." (*Id.*)

He currently had no hallucinations "but in 1992 . . . he was hearing voices that told him to commit suicide." (*Id.*) He still had periodic suicidal ideation. (*Id.*) He was sleeping "very poorly." (*Id.*) He reported severe depression every day, he felt angry and suspicious, he tried to be friendly, and he was fearful. (*Id.*) The impressions were "[m]ajor depression, second episode"; "[v]ision problems due to eye injury," chronic back pain, shoulder problems, and

"essential tremors"; severe "[p]sychosocial stressors"; and a Global Assessment of Functioning ("GAF")[2] score of fifty-five to sixty. (Tr. at 384.) The prognosis was "[f]air to guarded based upon treatment and change of his circumstances." (*Id.*) Dr. Kelwala stated Plaintiff was "extremely frustrated because he c[ould] not find a job due to his eye problems, his back pain, and some depression. These factors keep him down, and he would have some difficulty in finding a job . . . ." (*Id.*)

On December 16, 2010 Plaintiff went to the St. John Hospital Emergency Department complaining about pain and swelling in his right eye. (Tr. at 408, 416-26.) He was treated with Vicodin. (Tr. at 425.)

On January 6, 2011 Plaintiff went to St. John Providence Health System; he had been referred by his primary care physician. (Tr. at 391-93.) He was worried he would hurt himself or someone else. (*Id.*) He was depressed, had feelings of hopelessness, helplessness, and debilitating guilt, and perceived himself to be alone with no support. (*Id.*) He was assessed with a GAF score of sixty and told to begin outpatient therapy. (*Id.*)

On August 7, 2011, Plaintiff received an MRI of the cervical spine. (Tr. at 409-11.) Plaintiff reported a history of "[n]umbness in the hands, spasms in the back from the shoulders down on the right side to the legs with pain and dislocation of the right shoulder . . . [and] [n]umbness in extremities throughout the right side of the body." (*Id.*) The findings were "sagittal T1, T2 and inversion-recovery images reveal[ed] slight posterior prominence of the

---

[2] A GAF score of fifty-five to sixty indicates "[m]oderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000).

disc at C6-7. There [was] no evidence of Chiari malformation or metastatic disease"; C2-3, C3-4, and C4-5 were normal; "[t]here was mild broad-based bulging of the disk" for C5-6; "[t]here was mild broad-based bulging of the disk" for C6-7, which "compromis[ed] the subarachnoid space, but d[id] not compress the cervical spinal cord"; and for C7-T1 "[t]here [was] a very small, focal, area of midline prominence of the disc." (*Id.*) He also received an MRI of the lumbar spine. (*Id.*) The impression was as follows:

> (1) Mild degenerative changes at the L4-5 and L5-S1 disc levels. Mild diffuse disc bulge asymmetric to the left at L4-5, which contribute[d] to borderline spinal canal stenosis and mild-to-moderate left and mild right neural foraminal narrowing. Mild diffuse disc bulge with a superimposed small right paracentral disc protrusion and posterior annular tear at L5-S1. Mild narrowing of the inferior aspect of the left neural foramen at the L5-S1 level. The remaining lumbar discs [were] normal in height and signal. [And there was] [m]ild lower lumbar facet arthrosis. (2) Minimal . . . retrolisthesis of L5 on S1. Alignment [was] otherwise normal. [There was] [n]o evidence of fracture.

(*Id.*)

On August 11, 2011, Plaintiff was seen by Dr. Anil Sethi, M.D. (Tr. at 431.) After reviewing Plaintiff's MRI results, Dr. Sethi discussed the available treatment options, including physical therapy, epidural injections, and surgery. (Tr. at 429.) Plaintiff opted for physical therapy. (Tr. at 429-30.) Plaintiff had a full range of motion, 4/5 strength in the right upper extremity, decreased sensation through the C6 to C8 on the right, 4/5 strength in the right lower extremity, and decreased sensation throughout the entire right lower extremity. (Tr. at 432.) The same day, x-rays were taken of Plaintiff's cervical spine: there was straightening of the cervical spine, possibly caused by a spasm, and ligamentous injury could not be ruled out. (*Id.*)

### 2.   Function Reports

Plaintiff's wife completed Plaintiff's adult function report. Plaintiff said that his back sometimes went out, rendering him completely powerless–at these times he said he was unable to drive or even walk. (Tr. at 302.) He said his right eye was damaged and his vision in that eye was very dim and blurry. (*Id.*) He was very sensitive to light and had to wear sunglasses; his eye caused him severe migraine headaches. (*Id.*) His days mostly consisted of staying in his room and thinking. (Tr. at 303.) He had problems sleeping at night. (*Id.*) His wife helped him with his personal care because his hand shook. (Tr. at 304) His wife cooked for him and did the housework and yardwork because he was unable to stand or sit long enough and it was too hard on his back. (*Id.*) He did not go out alone because he did not trust people he did not know. (Tr. at 305.) He said he did not drive alone because his seizure had happened when he was driving. (*Id.*) He spent time with his wife and children, taking them to the park about two to three times a month. (*Id.*)

Plaintiff reported that his condition affected lifting, squatting, bending, standing, walking, sitting, stair climbing, seeing, memory, completing tasks, concentration, using hands, and getting along with others. (Tr. at 307.) He could walk a few blocks before taking about a ten to fifteen minute break. (*Id.*) He had been fired because of problems getting along with his supervisor, he did not handle stress well, and he did not handle changes in his routine well. (Tr. at 308.) He did not indicate that he needed a cane, but he did indicate that he used a back brace to take pressure off of his lower back. (*Id.*) In the remarks section, Plaintiff said that he was "severely depressed," worried about the state of his life, and felt useless. (Tr. at 309.)

Plaintiff's wife also completed a third party adult function report. (Tr. at 310-17.) It mostly reiterated Plaintiff's report. She said that Plaintiff would not take pills because they have made him uncomfortable ever since he attempted suicide by swallowing pills a long time

ago. (Tr. at 312.) She indicated that Plaintiff drove a car when he went out and that he could go

out alone. (Tr. at 313.) She said he watched television most of the day. (Tr. at 314.) She

estimated that he could not lift any more than forty pounds without strain and that he could not

complete most tasks because his hand would shake. (Tr. at 315.) She reported that he had little

patience. (*Id.*) She also did not indicate that he needed a cane but did indicate that he used a

back brace. (Tr. at 316.)

### 3.    Testimony at Administrative Hearings

At the September 15, 2011 hearing, Plaintiff testified that he had "constant headaches in

[his] eye" from his eye injury. (Tr. at 69-70.) They occurred at least three to four times a week,

and they lasted anywhere from two to two and a half hours. (*Id.*) He said he had to lie down to

get rid of the headache. (*Id.*) He also had problems with pain in his back; the pain shot all the

way down from his buttocks to his right foot, and he also had pain in his right shoulder, and the

right side of his neck, which made his right hand tremble. (Tr. at 71.) He said that his

depression prevented him from being active, responsive, or responsible; he was trying to make

sure it did not get as bad as when he was younger and had attempted suicide. (Tr. at 73.) The

only medicine Plaintiff was taking was eye drops. (Tr. at 74.) He was not sleeping through the

night, was getting only about two or three hours of sleep at night, and sometimes napped

during the day. (*Id.*) His wife helped with his daily needs. (Tr. at 75.) He had a valid North

Carolina driver's license but had not switched it to Michigan because he did not drive very

often. (Tr. at 75-76.) He tried to help his wife with housework, but was not able to do much

because of his condition. (Tr. at 76-77.) He said that his hobbies had never consisted of much

but sports and now he was unable to do sports. (*Id.*) He was able to sit for about thirty minutes

before he needed to stand up and move around and laying down was the most comfortable position for him. (Tr. at 78.)

At the September 6, 2012 hearing, Plaintiff testified that he received unemployment benefits after his alleged onset date. (Tr. at 47.) He explained that he needed the money to support his family and that he knew he would not be able to work. (*Id.*) Plaintiff testified that sunlight, bright light, light from television, and noise caused problems with his eye and triggered headaches. (Tr. at 50.) He said that he could watch about fifteen minutes of television before he would need a break. (*Id.*) Sometimes he wore sunglasses in the house. (Tr. at 53.) Plaintiff could do a household chore for only about fifteen minutes before he needed a break. (Tr. at 51.) He also had problems walking and was prescribed a cane. (Tr. at 51-52.) He said the entire right side of his body caused him problems, that he had a problem reaching out and grabbing objects, and would not even try to reach overhead with his right arm. (*Id.*) His dominant hand shook uncontrollably when he tried to write with his right hand. (Tr. at 52-53.)

### 4.    Vocational Expert Testimony at Administrative Hearings

At the September 6, 2012 hearing, ALJ Roulhac asked VE, Diane Regan, to consider a hypothetical individual with Plaintiff's age, education, and work experience who was,

> capable of performing work . . . at the light exertional level; lifting and carrying 20 pounds occasionally, 10 pounds frequently; stand[ing] or walk[ing] for approximately six hours per day; sit[ting] for approximately two hours in an eight-hour work day with normal breaks; occasional operation of foot controls; no climbing ladders, ropes, or scaffolds; occasionally could climb ramps or stairs, balance, stoop, kneel, crouch, . . . [and] crawl; only occasional overhead reaching and handling; avoid concentrated exposure to moving machinery; avoid all exposure to unprotected heights; occasional peripheral acuity and depth perception, or . . . jobs that require only occasional peripheral acuity and depth perception; and needs low-stress jobs with only occasional interaction with the public.

16

(Tr. at 53-55.) The VE testified that the individual would be able to be a visual inspector. (Tr. at 55.) The VE at the first administrative hearing had estimated that 12,500 visual inspector positions existed locally. (Tr. at 87.) The individual would also be able to perform work as a lobby attendant/greeter (1000 jobs in southeast Michigan and 60,000 in the national economy). (Tr. at 55-56.) The VE said this would not change if the hypothetical individual depended on a cane for balance. (*Id.*) The VE testified that if the individual had frequent interferences, that is thirty-four to sixty-six percent of an eight-hour workday, with attention and concentration, there would be no competitive employment. (Tr. at 56-57.) Likewise, the need for unscheduled breaks every thirty minutes would be work preclusive. (Tr. at 57.) Missing more than four days of work per month would also preclude competitive employment. (*Id.*) Adding a sit/stand option would preclude the greeter/lobby attendant positions. (Tr. at 58.)

### F.   Governing Law and Analysis

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen*, 800 F.2d at 545.

### 1.   Legal Standard

The ALJ determined that during the time Plaintiff qualified for benefits, he possessed the RFC

> to perform a light work as defined in 20 CFR 404.1567(b) except he can lift up to 20 pounds occasionally and lift or carry 10 pounds frequently. He can stand or walk for approximately 6 hours per 8-hour workday. He can sit for approximately 2 hours per 8-hour workday, with normal breaks. The claimant can occasionally operate foot controls, but cannot climb ladders, ropes, or scaffolds. He can occasionally climb ramps and stairs. The claimant can

17

occasionally balance, stoop, crouch, kneel, and crawl. He can occasionally perform overhead reaching and handling, and must avoid concentrated exposure to moving machinery. The claimant must avoid all exposure to unprotected heights. He has occasional peripheral acuity and depth perception. The claimant must be employed in a low stress job with only occasional interaction with the public.

(Tr. at 30.) Light work

involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

## 2.    Substantial Evidence

In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *see also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). A reviewing court must consider the evidence in the record as a whole, including any evidence that might subtract from the weight of the Commissioner's factual findings. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement that either the ALJ or the reviewing court

18

discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his [or her] written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan*, 474 F.3d at 833 (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)); *see also Mullen*, 800 F.2d at 545. Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994); *see also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

### a.   *The ALJ's Step-Three Findings*

Plaintiff argues that the ALJ's Step Three determination with respect to Listing 1.04(A) "is bereft of an actual discussion of the relevant evidence." (Doc. 12 at 23.) He also argues that the ALJ failed to get expert opinion evidence regarding medical equivalency at Step Three and instead relied exclusively on a single decisionmaker ("SDM"). (*Id.* at 26-27.) I suggest that Plaintiff failed to meet his Step Three burden, requiring that he show that his impairments met or were medically equivalent to Listing 1.04(A). I also suggest that because Plaintiff failed to

meet his burden, the ALJ did not need to provide a detailed explanation of why Plaintiff's impairments did not meet Listing 1.04 and did not err by omitting expert opinion evidence from his Step Three analysis.

Claimants with severe impairments that meet or equal a listing in the Appendix are deemed disabled without further analysis. 20 C.F.R. § 404.1520(a)(4)(iii). Fitting a claimant into a listing is dispositive and thus demands a higher level of proof. *See Zebley*, 493 U.S. 521, 525 (1990); *see also* 20 C.F.R. pt. 404, subpt. P, App. 1. Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. § 404.1525(c). A claimant must satisfy all of the criteria to meet the listing. *Id*; *see also Zebley*, 493 U.S. at 530 ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify.").

Importantly, the claimant carries the burden of proof at Step Three: When alleging that a listing has been met, a claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which describes how the impairment has such equivalency." *Thacker v. Social Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 2004) (citation omitted). Consequently, an ALJ's Listing analysis must always be viewed in light of the evidence the claimant presents.

I suggest that Plaintiff failed to meet his burden at Step Three. Listing 1.04 comprises "[d]isorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04.

Plaintiff specifically argues that the ALJ should have considered his impairments under Listing 1.04(A), which requires evidence of nerve root compression. *Id.* § 1.04(A). Cases discussing compression vary in their analyses. Some look for concrete proof of actual compression, rather than mere suggestions that a nerve root is affected, to trigger further inquiry or otherwise support the claimant. *See, e.g.*, *Adams v. Comm'r of Soc. Sec.*, No. 13-11132, 2014 WL 897381, at *9 n.5 (E.D. Mich. Mar. 6, 2014) (noting that recent MRI results would not have altered the ALJ's decision on nerve root compression because they "indicate only that a disc protrusion '*abuts* the S1 nerve roots,' not that there is evidence of nerve root *compression*") (adopting Report and Recommendation); *Barnes v. Comm'r of Soc. Sec.*, No. 12-CV-15256, 2013 WL 6328835, at *9 (E.D. Mich. Dec. 5, 2013) ("[Claimant's] x-ray and CT scan show degenerative disc disease and spinal canal stenosis, but there is no mention of nerve root compression in the radiologist's reports."). One court noted that "none of the medical records expressly state that plaintiff suffers from nerve root compression. An implication, based on radiating pain, is not enough to satisfy the Listing [1.04]." *Miller v. Comm'r of Soc. Sec.*, 848 F. Supp. 2d 694, 709 (E.D. Mich. 2011) (adopting Report & Recommendation). Further the plaintiff there did "not point to any positive straight leg raising tests in both the sitting and supine positions. Absent such results, plaintiff cannot meet the listing." *Id.* (citations omitted). Other cases treat a broader range of descriptions in the treatment notes as representing compression. *See, e.g.*, *Thomas v. Comm'r of Soc. Sec.*, No. 12-14758, 2014 WL 688197, at *6-8 (E.D. Mich. Feb. 21, 2014) (finding that nerve root impingement was equal to nerve root compression). The Sixth Circuit has addressed the "strict requirements" of this Listing. *Lawson v. Commissioner of Social Security*, 192 F. App'x 521,

529, 530 (6th Cir. 2006). There, the plaintiff's reflexes and range of motion were normal; accordingly she did not meet Listing 1.04(A). *Id.* at 529-30.

In this case, Plaintiff failed to meet his burden to show that his impairments met or were medically equivalent to Listing 1.04(A) because there is no evidence of nerve root compression, Plaintiff's straight leg test was negative, (Tr. at 347-49), and Dr. Sethi found that he had a normal range of motion. (Tr. at 432.) Further, Plaintiff also would not meet his burden under 1.04(B) or 1.04(C). Listing 1.04(B) requires specific medical proof of spinal arachnoiditis, *Lawson*, 192 F. App'x at 530, and the medical record shows none. Listing 1.04(C) requires an inability to ambulate effectively. "Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00(B)(2)(b). An individual meets this condition when, for example, they need two crutches or canes, cannot walk without a walker, cannot travel alone, cannot use public transportation, or cannot walk. *Id.* Plaintiff only has been prescribed one cane, (Tr. at 445), so he has not met his burden for Listing 1.04(C).

Plaintiff argues that the ALJ's Step Three determination with respect to Listing 1.04(A) "is bereft of an actual discussion of the relevant evidence." (Doc. 12 at 23.) However, an ALJ is not required to consider every Listing or to consider Listings that claimants "clearly do[] not meet." *Sheeks v. Commissioner of Social Security Administration*, 554 Fed. App'x 639, 641 (6th Cir. 2013). The claimant carries the burden of proof at Step Three and therefore, as the Third Circuit has observed, the ALJ's analysis does not need to be extensive if the claimant fails to produce evidence that he or she meets the Listing. *Ballardo v. Barnhart*, 68 F. App'x

337, 339 (3d Cir. 2003) (finding that a conclusory, single-sentence analysis was adequate where the claimant "presented essentially no medical evidence of a severe impairment"). In this case, I suggest that the ALJ's statement that "no treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment," and the fact that he had considered all of the listings "with specific emphasis on," among others, Listing 1.04, (Tr. at 28), is sufficient in light of the fact that Plaintiff failed to meet his burden at Step Three.[3]

Plaintiff also argues that the ALJ failed to get expert opinion evidence regarding medical equivalency at Step Three and instead relied exclusively on an SDM.[4] (Doc. at 26-27.) Medical equivalency determinations are treated differently from whether a claimant meets a listing. *Fowler v. Comm'r of Soc. Sec.*, No. 12-12637, 2013 WL 5372883, at *12. Social Security Ruling 96-6p states, that "longstanding policy requires that the judgment of a physician (or psychologist) designated by the commissioner on the issue of equivalence on the evidence before the [ALJ] . . . must be received into the record as expert opinion evidence and

_____

[3] I also suggest that even though unnecessary, the ALJ did provide a detailed analysis for why Plaintiff's impairments did not meet Listing 1.04(A). Defendant cites *White v. Colvin*, No. 4:12-cv-11600, 2013 WL 5212629 (E.D. Mich. Sept. 16, 2013) for the proposition that a court "is not constrained to reviewing solely the ALJ's Step Three analysis." *Id.* at *7 (citing *Bledsoe*, 165 F. App'x at 411 (finding Step Three analysis sufficient because the ALJ "described evidence pertaining to all impairments, both severe and non-severe, for five pages earlier in his opinion and made factual findings")). In this case, at Step Four the ALJ noted that the "MRIs did reveal some degenerative issues. . . . [The] lumbar spine MRI revealed mild disc bulges, borderline stenosis, and minimal retrolisthesis. . . . [The] cervical spine MRI revealed a bulging disc at C6-7, and a very small, very focal area of midline prominence at C7-T1. (Tr. at 33.) He also found that, upon examination Plaintiff's gait and stance were normal, he had a full range of motion in his neck, that scans of his neck and back "failed to detect any significant abnormalities," and that the only straight leg test in evidence was negative. *Id.* I suggest that just as in *White*, this analysis, even though it was not done at Step Three, showed the ALJ's Step Three reasoning.

[4] The single decisionmaker ["SDM"] model stems from 20 C.F.R. §§ 404.1406(b)(2) and 404.906(b)(2) These regulations provided for experimental, stream-lined procedures that eliminated the reconsideration level of review and allowed claims to go directly from the initial denial to the ALJ hearing. *Crooks v. Comm'r of Soc. Sec.*, No. 12-cv-13365, 2013 WL 4502162, at *9 (E.D. Mich. Aug. 22, 2013). "Most significantly, it allowed the state agency employee (the SDM) to render the initial denial of benefits without documenting medical opinions from the state agency medical consultants." *Id.*

given appropriate weight." 1996 WL 374180, at *3. "Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue." *Fowler*, 2013 WL 5372883, at *12 (citing *Barnett v. Barnhart*, 381 F.3d. 664, 670 (7th Cir. 2004)). According to the Sixth Circuit, "Generally, the opinion of a medical expert is required before a determination of medical equivalence is made." *Retka*, 1995 WL 697215, at *2.

The need for an expert opinion can be met with a signature on a Disability Determination Transmittal Form. *Hayes v. Comm'r of Soc. Sec.*, No. 11-14596, 2013 WL 766180, at *9 (E.D. Mich. Feb. 4, 2013) *report and recommendation adopted*, 2013 WL 773017 (E.D. Mich. Feb. 28, 2013). In this case the only signature on the Disability Determination Transmittal Form is Judy Cain, an SDM. (Tr. at 93; 125.) Plaintiff also underwent two consultative examinations, (Tr. at 376-80, 381-85), however neither referral completed a Disability Determination Transmittal Form. Therefore the ALJ did not get an expert opinion on the question of equivalency.[5]

However, since the burden at Step Three falls on the claimant, the ALJ's analysis at this step must always be viewed in light of the evidence presented by the claimant. In *Retka*, the Sixth Circuit noted the need for expert opinions on the equivalence part of the analysis, but quickly shifted the focus to the "claimant's burden . . . to bring forth evidence to establish that

---

[5] Defendant cites *Gallagher v. Commissioner of Social Security*, 2011 WL 3841632 (E.D. Mich. Mar. 29, 2011) and *Timm v. Commissioner of Social Security*, 2011 WL 846059 (E.D. Mich. Feb. 14, 2011) for the proposition that when the SDM model is utilized by the state agency, an ALJ does not err "in making the determination of whether Plaintiff's impairment meet[s] or equal[s] a Listing." (Doc. 13 at 17-18 (quoting *Timm*, 2011 WL 846059, at *4).) However, in *Fowler*, this District found *Gallagher* and *Timm* unpersuasive. 2013 WL 5372883, at *3 ("While courts in this district have concluded that the ALJ need not obtain expert opinion evidence in cases involving an SDM, the undersigned does not find these cases persuasive. In both cases, the court concluded that because the regulations permitted an SDM to make disability determination without a medical consultant, that the ALJ is, therefore, also permitted to do so where the 'single decisionmaker' model is in use. However, nothing about the SDM model changes the ALJ's obligations in the equivalency analysis.").

he or she meets or equals a listed impairment." 1995 WL at *2 ("The absence in the record of medical evidence showing significant neurological deficits and muscle atrophy supports the ALJ's conclusion . . . . [And] [t]hus, there is no merit to the plaintiff's argument that the ALJ erred in failing to find his condition equivalent to the Listing . . . ."). In that case, the ALJ had scoured the record, found that the plaintiff had produced no evidence supporting disabling pain, and thus the Court rejected the attack on the decision. *Id.*

Likewise, in this case, the ALJ scoured the record and found that Plaintiff did not produce evidence of nerve root compression, a positive straight leg test, or inability to ambulate effectively. Therefore, he did not err by not relying on an expert medical opinion in his equivalency finding.

### b.    *Treating Source Opinions*

Plaintiff also argues that "the ALJ erred in his evaluations of Dr. Lakhani's 2011 medical source statement and Dr. Austin's 2012 medical source statement." (Doc 12 at 30.) He complains that the ALJ's rationale for giving these opinions "little weight" are conclusory, and that the ALJ was required to provide "good reasons" declining to give controlling weight. (*Id.* at 30-33.)

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources, including treating source opinions that have not been given controlling weight, 20 C.F.R. § 404.1527(c), and the ALJ should use the same analysis for "other source" opinions. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2.

Further, an ALJ must give a treating physician's opinions regarding the nature and severity of a claimant's impairments controlling weight when they are "well-supported by

25

medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); SSR 96-2p, 1996 WL 374188, at *1-2; *see also Wilson*, 378 F.3d at 544. Matters that are reserved to the Commissioner are not "medical opinions," so they do not receive this deference. 20 C.F.R. § 404.1527(d)(2). Additionally, a physician's notations of a claimant's subjective complaints is the "'opposite of objective medical evidence'" and the ALJ need not give the opinions based solely on those assertions controlling weight. *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)). The regulations also require an ALJ to provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007).

Both Dr. Lakhani and Dr. Austin completed RFC questionnaires that indicated Plaintiff had major limitations. (Tr. at 412-15, 454-59.) However, the only real difference between these two forms is the handwriting, and the fact that Dr. Lakhani indicated Plaintiff did not need a cane or other assistive device, (Tr. at 414), while Dr. Austin indicated that Plaintiff did need a cane or other assistive device. (Tr. at 458.) Further, all of the limitations in these forms were the result of suggestive multiple-choice questions. *Cf. Cheatham v. Comm'r of Soc. Sec.*, No. 12-11428, 2013 WL 1843400, at *8 (E.D. Mich. Oct. 2, 2013) ("Dr. Soares did no more than simply check boxes indicating Plaintiff's various limitation."). The ALJ points out that the forms were similar, and also notes that their conclusions are "completely inconsistent with the weight of the evidence." (Tr. at 33.) The ALJ notes that while the "MRI's do indicate some limitation in the claimant's back and neck, they are not supportive of the extreme limitations provided by the claimant's physicians." (*Id.*) I suggest that, while the ALJ's statement that

26

these opinions are "*completely* inconsistent" goes too far, enough inconsistencies exist in the record to justify his decision. Additionally, the ALJ gives other reasons for the weight assessed. He points out that the MRI results do not lead to such extreme limitations, and also that the two treating source statements are very similar. (Tr. at 33.) Therefore, I suggest the ALJ sufficiently articulated the reasons for the weight he gave to these sources.

I also suggest that the ALJ's determination was supported by substantial evidence. Plaintiff's MRI showed,

> (1) Mild degenerative changes at the L4-5 and L5-S1 disc levels. Mild diffuse disc bulge asymmetric to the left at L4-5, which contribute[d] to borderline spinal canal stenosis and mild-to-moderate left and mild right neural foraminal narrowing. Mild diffuse disc bulge with a superimposed small right paracentral disc protrusion and posterior annular tear at L5-S1. Mild narrowing of the inferior aspect of the left neural foramen at the L5-S1 level. The remaining lumbar discs [were] normal in height and signal. [And there was] [m]ild lower lumbar facet arthrosis. (2) Minimal . . . retrolisthesis of L5 on S1. Alignment [was] otherwise normal. [There was] [n]o evidence of fracture.

(Tr. at 409-11.) Further, Plaintiff's gait was normal on more than one occasion, (Tr. at 347-49), and he had a negative straight leg test. (Tr. at 347-49.) At his consultative exam, he was able to get on and off the examination table without difficulty, he was able to tandem and heel-toe walk, he was able to squat, and his grip was equal bilaterally. (Tr. at 378.) Additionally, Plaintiff had a full range of motion in both hips, knees, and ankles without limitation when he was seen at the emergency room on June 24, 2010, and he had a full range of motion when he was seen by Dr. Sethi on August 11, 2011 (Tr. at 347, 431.) This evidence directly contradicts Dr. Lakhani's and Dr. Austin's only objective findings, besides the MRI and the ocular testing: they both found that Plaintiff had decreased range of motion in his neck. (Tr. at 412, 456.) The ALJ also calls attention to the conservative course of Plaintiff's treatment as evidence that these opinions are not consistent with the record. (Tr. at 33.) With the exception of range of

27

motion tests, which were inconsistent with the record, and the mild MRI results, there is no indication that these opinions were based on anything other than Plaintiff's subjective complaints. Therefore the ALJ did not need to give them controlling weight. *See* 20 C.F.R. § 404.1527(d)(2); SSR 96-2p, 1996 WL 374188, at *1-2; *see also Wilson*, 378 F.3d at 544.

I further suggest that the ALJ properly applied the six-factor balancing test to determine the probative value of Dr. Lakhani's and Dr. Austin's opinions after he had determined that he would not give their opinions controlling weight. *See* 20 C.F.R. § 404.1527(c). Therefore, I suggest that the ALJ's determination that these opinions be afforded "little weight" was supported by substantial evidence.

### c.   *Concentration, Persistence, and Pace in RFC*

Plaintiff also argues that the ALJ failed to properly account for Plaintiff's moderate limitations in concentration, persistence, and pace ("CPP") in the RFC. (Doc. 12 at 28.) At Step Three, the ALJ found that Plaintiff had moderate difficulties with regard to concentration, persistence, or pace. (Tr. at 29.) Plaintiff contends that the RFC limiting him to a "low stress job with only occasional interaction with public," (Tr. at 30), did not properly account for his limitations in CPP. (Doc. 12 at 28-29.)

At Step Five, the burden shifts to the Commissioner, who must prove that "other work exists in the national economy that plaintiff can perform." 20 C.F.R. §§ 404.1520, 416.920. "In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010). Plaintiff argues that the ALJ erred by

28

failing to "properly account for [his] limitations in concentration, persistence, and pace

("CPP") in his RFC assessment and corresponding hypothetical to the VE." (Doc. 12 at 28.)

Plaintiff's argument is "not uncommon and the case law resolves it both ways."

*Hernandez v. Comm'r of Soc. Sec.*, No. 10-cv-14364, 2011 WL 4407225, at *9 (E.D. Mich.

Aug. 30, 2011) (collecting cases). The *Hernandez* court stated that

> a hypothetical simply limiting a claimant to unskilled work may, in some
> instances, fail to capture a claimant's moderate limitation in concentration,
> persistence, or pace . . . . However, the Court also finds that there is no bright-
> line rule requiring remand whenever an ALJ's hypothetical includes a limitation
> of, for example, "unskilled work" but excludes a moderate limitation in
> concentration. Rather, this Court must look at the record as a whole and
> determine if substantial evidence supports the ALJ's hypothetical and RFC
> assessment.

*Id.* at *10 (citations omitted). In some cases courts will remand when an ALJ's "hypothetical

does not include a specific reference to moderate limitations in concentration or pace and only

limits the hypothetical individual to unskilled work or simple, routine tasks," but "other cases

have found that an ALJ formed an accurate hypothetical by limiting the claimant to unskilled

work and omitting a moderate concentration or pace limitation." *Taylor v. Commissioner of

Soc. Sec.*, No. 10-CV-12519, 2011 WL 2682682, at *7 (E.D. Mich. May 17, 2011) *report and

recommendation adopted*, No. 10-12519, 2011 WL 2682892 (E.D. Mich. July 11, 2011).

Dr. Lakhani and Dr. Austin both indicated in their RFC questionnaires that Plaintiff's

depression affected his physical condition. (Tr. at 412-15, 454-59.) Both doctors also indicated

that Plaintiff would be unable to perform even low stress jobs. (*Id.*) As suggested above, the

ALJ's determination that these sources be afforded "little weight" was supported by substantial

evidence. *See supra* Part II.F.2.b. In addition to the RFC questionnaires, at Plaintiff's

consultative examination Dr. Kelwala indicated that Plaintiff would have "some difficulty in

finding a job." (Tr. at 381-85.) At Step Three the ALJ found that Plaintiff would have

difficulty with concentration, finishing tasks, and following written and spoken instructions. (Tr. at 29.) He also indicated that Plaintiff was able to manage his personal finances. (*Id.*) In light of this record, I suggest that the ALJ properly integrated Plaintiff's moderate limitations in concentration, persistence, and pace into his RFC finding at Step Four by limiting Plaintiff to a "low stress job with only occasional interaction with the public." (Tr. at 30.)

### d.    The ALJ's Credibility Determination

Plaintiff also argues that the ALJ's credibility findings were not supported by substantial evidence because they "ignored the instructions from the Appeals Council and the requirements of SSR 96-7p and 20 C.F.R. § 404.1529."[6] (Doc. 12 at 19.)

The regulations establish the following process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. First, the ALJ evaluates symptoms by confirming, with medical signs and laboratory findings, that a medical impairment exists which "could reasonably be expected to produce the pain or other symptoms. 20 C.F.R. § 404.1529; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). Next, the ALJ determines the extent of work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While a claimant's description of symptoms alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a), an ALJ may not disregard a claimant's subjective complaints about the severity and persistence of symptoms

---

[6] The Appeals Council instructed ALJ Roulhac to "[f]urther evaluate [Plaintiff's] subjective complaints and provide rationale in accordance with the disability regulations pertaining to evaluation of the symptoms." (Tr. at 113-14.)

simply because substantiating objective evidence is lacking. SSR 96-7p, 1996 WL 374186, at

*1. Instead, the absence of confirming objective evidence regarding the severity and

persistence of symptoms forces an ALJ to consider these factors:

> (i) . . . [D]aily activities; (ii) The location, duration, frequency, and intensity of
> . . . pain or other symptoms; (iii) Precipitating and aggravating factors; (iv)
> The type, dosage, effectiveness, and side effects of any medication . . . taken
> to alleviate . . . pain or other symptoms; (v) Treatment, other than medication,
> . . . received for relief of . . . pain or other symptoms; (vi) Any other measures
> . . . used to relieve . . . pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); *Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3.

The claimant's work history and the consistency of any subjective statements are also relevant.

20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of

witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247; *see also Cruse*, 502 F.3d at

542 (noting that the "ALJ's credibility determinations about the claimant are to be given great

weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and

credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is

appropriate where an ALJ finds contradictions among medical reports, claimant's testimony,

and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a

claimant's subjective complaints and may . . . consider the credibility of a claimant when

making a determination of disability."). "However, the ALJ is not free to make credibility

determinations based solely upon an 'intangible or intuitive notion about an individual's

credibility.'" *Rogers,* 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

Additionally, an ALJ is required to fully explain credibility determinations. *See Rogers*,

486 F.3d at 248 ("[B]lanket assertions that the claimant is not believable will not pass muster,

nor will explanations as to credibility which are not consistent with the entire record and the

weight of the relevant evidence."); *see also Hurst v. Sec'y of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir. 1985) (finding that it is "absolutely essential for meaningful appellate review" for an ALJ to articulate the reasons "for crediting or rejecting particular sources of evidence" (quoting *Zblewski v. Schweiker*, 732 F.2d 75, 78 (7th Cir. 1984))). Social Security Ruling 96-7p states that,

> It is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

1996 WL 374186, at *2.

After determining Plaintiff's RFC, the ALJ stated that he considered all Plaintiff's "symptoms and the extent to which" they could "reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p." (Tr. at 30.) He then reiterated some of Plaintiff's statements regarding why Plaintiff was unable to work:

> [Plaintiff] stated that his entire right side is in pain, and he must use a cane to ambulate. [He] also stated that his eye was injured many years ago, and he is very sensitive to light. He stated that depending on the lighting, a computer or television screen would bother him. [Plaintiff] stated that he can perform household chores, but he needs to take breaks every 15 minutes. He stated that he also has problems with his hands, and he has difficulty reaching over head and holding objects. He stated that if he tries to write, his hands shake uncontrollably.

(Tr. at 31.) Next follows the only place that the ALJ mentions the weight he gives Plaintiff's

above statements[7]:

> After careful consideration of the evidence, the undersigned finds that the
> claimant's medically determinable impairments could reasonably be
> expected to cause the alleged symptoms; however, the claimant's
> statements concerning the intensity, persistence and limiting effects of these
> symptoms are not credible to the extent they are inconsistent with the above
> [RFC] assessment.

(Tr. at 31.) Plaintiff argues that the ALJ erroneously dismissed Plaintiff's credibility using this

"result-oriented" boilerplate language and failed to construct a logical bridge to connect the

boilerplate language to any credibility determination. (Doc. 12 at 19, 22.)

I suggest that this boilerplate language alone is not "sufficiently specific to make clear"

the weight the ALJ gave to Plaintiff's statements and the reasons for that weight, and therefore

does not meet the requirements of Social Security Ruling 96-7p. SSR 96-7p 1996 WL 374186,

at *2; *see Parker v. Astrue*, 597 F. 3d 920, 922 (7th Cir. 2010) (finding the same language to be

"meaningless boilerplate. . . . [because it] yields no clue to what weight the trier of fact gave

the testimony") (Posner, J.).

However, the boilerplate language is not the only place the ALJ assesses Plaintiff's

credibility. The ALJ found that Plaintiff's "treatment record does not support the severity of

[his] allegations," (Tr. at 31), and that "[o]verall, the claimant's minimal treatment, lack of

hospitalizations, and conservative care . . . supports the above [RFC]. Considering these factors

the combination of the claimant's mental and physical issues is not severe enough to warrant a

finding of disabled," (Tr. at 35). With regard to Plaintiff's statements about his right eye, the

---

[7] The ALJ did specifically state that he found credible Plaintiff's statements about knowing he could not work and nonetheless seeking unemployment benefits; this was one of the issues on remand from the Appeals Council. (Tr. at 31.)

ALJ noted that Plaintiff's treatment had been intermittent and that he had not been seen at all in 2009 or 2010. (Tr. at 31.) He considered that Plaintiff had not followed up with his eye specialist after he had gone to the emergency room on December 15, 2010. (*Id.*) He also noted that Plaintiff never returned to Dr. Chow's office after his September 7, 2011 visit. (*Id.*) The ALJ also considered the fact that Plaintiff was able to drive a car and go into public alone and concluded that "[w]hile the claimant clearly does have limitations due to his right eye blindness, it is not as severe as alleged." (Tr. at 32.)

The ALJ next addressed Plaintiff's statements regarding his back and neck pain. (*Id.*) He considered Plaintiff's conservative treatment, Plaintiff's failure to consult a neurologist as recommended, the long gap in his treatment, and the lack of evidence he went to physical therapy. (Tr. at 32-33.) For Plaintiff's allegations of migraine headaches, the ALJ's noted that Plaintiff "had not seen a neurologist for his headaches since they began in 2005." (Tr. at 32.) He also said that Plaintiff's treatment had been conservative. (Tr. at 33.) For Plaintiff's statements regarding the severity of his mental impairments, the ALJ considered that Plaintiff had received very little treatment, noting that he had not had any psychological treatment from 2009 to 2010 and that he had admitted to Dr. Kelwala that he had not had any psychiatric treatment since 1993. (Tr. at 34.) The ALJ also noted that Plaintiff failed to follow up with a counselor as recommended after his January 6, 2011 visit to Eastwood Clinic. (Tr. at 34.)

While nowhere in his findings did the ALJ specifically assign a weight to Plaintiff's credibility, he provided a detailed analysis of Plaintiff's credibility and considered the relevant factors. From this analysis it is clear that he found Plaintiff only partially credible. I therefore suggest that his determination was supported by substantial evidence.

### G.   Conclusion

For these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

## III.   <u>REVIEW</u>

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P.

72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: December 22, 2014                    /S PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge

36